**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JAY JIAN-QING WANG,**

                    **Plaintiff,**

        **-against-**                                          **09-CV-306**

**MARY ANN SWAIN; ERIC J COTTS;**
**ROBERT L POMPI; STANLEY WHITTINGHAM;**
**JEAN-PIERRE MILEUR,**

                    **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

**DECISION & ORDER**

**I.        INTRODUCTION**

        Plaintiff, a former professor at the State University of New York at Binghamton,

commenced this action asserting claims of unlawful age, race and national origin

discrimination in violation of 42 U.S.C. §§ 1981, 1983 and 1985 after he was denied

tenure.  See Compl. [dkt. # 1].[1]  Defendants move for summary judgment seeking to

dismiss Plaintiff's claims _en toto_.  See dkt. # 45 & # 47.  Plaintiff opposes the motion, see

dkt. # 48, and Defendants have filed a reply to that opposition.  See dkt. # 50.  For the

reasons that follow, Defendants' motion is granted.

_____

        [1]Plaintiff was originally proceeding _pro se_ but is now represented by counsel.

1

## II.      STANDARD OF REVIEW

On a motion for summary judgment the Court must construe the properly disputed facts in the light most favorable to the non-moving party, see Scott v. Harris, 127 S. Ct. 1769, 1776 (2007), and may grant summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). While the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his favor, Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002), a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings. Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994); Fed. R. Civ. P. 56(e).

The Local Rules of the Northern District provide a procedure for the efficient

2

resolution of summary judgment motions.  See N.D.N.Y.L.R. 7.1(a)(3).  This places the onus on the parties to present the evidence that either supports or defeats the motion.   A movant must set forth the undisputed facts that, it contends, entitles it to summary judgment in a Statement Of Material Facts.  See N.D.N.Y.L.R. 7.1(a)(3).  "Each fact listed shall set forth a specific citation to the record where the fact is established."  Id.

Once a properly supported Local Rule 7.1(a)(3) Statement of Material Facts is submitted, the non-moving party must "file a response to the [movant's] Statement of Material Facts."  Id.  This requires a statement that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs." Id.  "Each denial shall set forth a specific citation to the record where the factual issue arises."  Id.  Conclusory denials unsupported by specific citations to the record are insufficient.  See N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc., 426 F.3d 640, 648-49 (2d Cir. 2005).[2]  Likewise, a simple citation to an "exhibit" consisting of numerous documents, or citation to a deposition without a pinpoint citation to where in the deposition support for the denial is contained, is insufficient. See Bronner v. Catholic Charities of Roman Catholic Diocese of Syracuse, Inc., 2010 WL 981959, at *1 (N.D.N.Y. March 15, 2010);[3] Riley v. Town of Bethlehem, 5 F.

---

[2](upholding grant of summary judgment where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitting a responsive Rule 7.1(a)(3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations.")

[3]("Most of the items . . . are 'Exhibits' in excess of thirty (30) un-paginated pages, with each exhibit consisting of various types of documents. . . . What is most distressing for the Court is not the sheer volume of documents, but rather the way that Plaintiff's counsel attempts to use the documents.  In most instances, Plaintiff simply cites to the documents generally, i.e., a simple cite to the exhibit number, and in many instances, cites to numerous exhibits to support a single proposition.  Apparently, Plaintiff or his attorneys expect the Court to wade through the mass of paper to find whether or not the "cite" supports a proposition made by Plaintiff, or creates a genuine issue of material fact. . . .  The Court declines the invitation to do

Supp.2d 92, 93 (N.D.N.Y.1998).[4]   The Court is not required to search the record for

evidence that the parties fail to point out in their Local Rule statements. See Amnesty

America v. Town of West Hartford, 288 F.3d 467, 470 (2d Cir. 2002);[5] Monahan v. New

York City Dep't of Corrections, 214 F.3d 275, 291 (2d Cir. 2000).[6]   The Court shall deem

admitted properly facts set forth in a movant's Statement of Material Facts that the

opposing party has not specifically or properly controverted.  N.D.N.Y.L.R. 7.1(a)(3).

    With these standards in mind, the Court will address the pending motion.

## III.    BACKGROUND[7]

    Jay Jian-Qing Wang ("Plaintiff") is a fifty-year old male born in China of Asian

descent.  He was awarded a Ph.D. in Condensed Matter Physics from the University of

Science and Technology of China in 1991.  In September 2001, Plaintiff was hired by the

State University of Binghamton ("Binghamton University" or "University") as an Assistant

Professor of Physics.

    Defendant Mary Ann Swain was the Provost and Vice President for Academic

---

counsel's work.")(citations omitted)

    [4](By "providing precise citations to the record where the disputed [or undisputed] facts are located, both parties and the Court can move immediately to the gravamen of the case; absent this forced focus, the parties' briefs can remain, as is often the case, as 'two ships passing in the night'. . . . If the facts supporting the arguments are in the record, counsel should be able to cite to them." ).

    [5]("We agree with those circuits that have held that FED. R. CIV. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.")(citations omitted)

    [6](The Local Rules require the parties "to clarify the elements of the substantive law which remain at issue because they turn on contested facts" and the Court "is not required to consider what the parties fail to point out.")(internal quotation marks and citations omitted)

    [7]Unless indicated otherwise, the following facts are taken primarily from Defendants' Amended Statement of Material Facts [dkt. # 47] containing facts that are either admitted by Plaintiff or which are not properly controverted. See Resp. 7.1(a)(3) Stat. [dkt. # 48-2].

Affairs at the University at all times relevant to this action.  Defendant Eric J. Cotts is and was the Chair of the Department of Physics at the University.  Defendant Robert L. Pompi was the Chair of the Initiating Personnel Committee ("IPC") and a member of the University Personnel Committee ("UPC") which reviewed Plaintiff's tenure application.  Defendant M. Stanley Whittingham was the Director of Materials Science and Engineering at the University.  Defendant Jean-Pierre Mileur was a former college Dean at the University. Id. ¶ 12.

In the 2003-2004 academic year, Plaintiff underwent his first review by the Initiating Personnel Committee ("IPC").  After conducting a standard review of his case, the IPC voted to recommend a three year renewal for Plaintiff.

Faculty members employed at Binghamton University in a tenure track position for 6 years must participate in a mandated review for purposes of tenure and promotion consideration.  Each of the steps in this review is mandatory unless the applicant voluntarily withdraws his name for consideration for tenure.  Professor Wang was notified that he was being considered for tenure in September 2006.  He did not withdraw his name for consideration so his review proceeded in accordance with the University's procedure for promotion and tenure consideration.  First, Professor Wang was given a document submission deadline of September 11, 2006.   After Professor Wang submitted documents, the Initiating Personnel Committee ("IPC"), comprised of persons within the same department as the applicant, convened to decide if the committee will recommend tenure.  This decision in all such cases is based on review of the submitted documentation, written recommendations by persons (some solicited by the applicant), and any discussion had by the Committee. The IPC also takes into account the personal

5

knowledge of the applicant.

The IPC committee in the Plaintiff's case was comprised of faculty members Robert Pompi, Masatsugu Suzuki, Eric Cotts, Tsu Ming Wu, Newton Greenberg, Srinivasa Venugopalan and Charles Nelson.  The deliberations of the IPC Committee involved the examination of the issues of research, teaching, and service.  It was determined that Professor Wang's service was at an acceptable level for a junior faculty member.  However, even though Plaintiff had received some positive teaching evaluations from some students and supportive responses from colleagues, see Pl. Ex. A, parts 1-2, his teaching evaluations were widely criticized and considered unacceptable. See IPC March 14, 2007 Report to UPC, Def. Ex. A, pp. 11-14.   Furthermore, the IPC concluded that the most severe weakness in Professor Wang's portfolio came from the evaluation of his research efforts. Id.  The IPC committee found it problematic that, as to his research endeavors, Plaintiff had published only 4 papers based on his work at the University. Id.

Reports from outside evaluators who provided their input during the tenure application process, some requested to participate by the University and some by Plaintiff, were also considered.  In the whole, these reports were equivocal as to the promotion and tenure determination. See Def. Ex. C.  One evaluator considered Plaintiff's case for promotion and tenure "to be marginal due mainly to the lack of publication," Def. Ex. C-1; one evaluator recommended Plaintiff for promotion and tenure based upon his research although the evaluator did not "know anything about [Plaintiff's] teaching" performance, Def. Ex. C-2; one evaluator noted that Plaintiff was well known for his research, appeared (based on his CV) to have "a functioning laboratory that involves graduate students and post-docs," seemed to have "secured significant external funding," and appeared to have

6

been "quite successful in establishing a research program at Binghamton University," but the evaluator did not comment on Plaintiff's teaching performance and did not make a recommendation for or against tenure, Def. Ex. C-3; one evaluator noted that Plaintiff was "apparently successful in attracting grants and contracts for his research" but opined that Plaintiff's "research accomplishments at Binghamton University would be too weak for promotion in most universities," and concluded that "[u]ltimately, his promotion will be decided . . . based on his teaching performance and research accomplishments at Binghamton University," Def. Ex. C-4; one evaluator concluded that he/she would not support Plaintiff for promotion if Plaintiff were a candidate at that evaluator's university, Def. Ex. C-5; and one evaluator concluded that Plaintiff's case "presents a strong case for promotion to a tenured associate professor" based upon Plaintiff's "scholarly productivity and originality" and his success at obtaining external funding, but the evaluator did not comment upon Plaintiff's teaching abilities or performance. Def. Ex. C-6.

The IPC, after review, recommended against granting tenure for Plaintiff. The vote was 6 against tenure, none for, and one abstaining. The IPC decision was sent to the Chair of the Physics Department. The Chair, Defendant Cotts, reviewed the submitted documentation and decision of the IPC and, by letter dated March 9, 2007, concurred with the IPC and recommended against tenure.

Cotts' recommendation was then forwarded to Defendant Jean-Pierre Mileur, as college Dean, for review and recommendation.  Dean Mileur, as permitted by the process, requested a Formal Review on May 3, 2007.  A Formal Review is an optional step, conducted by a University Personnel Committee ("UPC") comprised of faculty members from across the University. The UPC conducts a review of the submitted documentation,

including the recommendations for/against tenure; interviews the candidate and any

persons the candidate invites for an interview; and considers the recommendation from

the chair of the applicant's department.  Members of the IPC attended the meeting with

the UPC.

The UPC conducted and completed its formal review, consisting of review of the

submitted documentation, the recommendations received from the IPC and the Physics

Department Chair, input from the Provost, interviews with Prof. Wang, and, at Prof.

Wang's invitation, interviews with professors Jaye Fang, Stanley Whittingham,[8] Wayne

Jones and Paul Parker.  On May 22, 2007, the UPC unanimously recommended against

tenure by a vote of 8-0 vote with one abstention.

On June 19, 2007, after receipt of the formal review decision, Dean Mileur issued a

written decision not to recommend tenure. The documentation and decisions to date were

then forwarded to Provost Mary Ann Swain for review and recommendation.

On June 20, 2007, Provost Swain recommended not to offer tenure. The Provost's

decision, along with the documentation generated to date, was then forwarded

to Lois B. DeFleur, the then-President of the University, for review and determination.

DeFleur determined on June 27, 2007 not to recommend tenure. This ended the tenure

review process for Professor Wang.[9]

Professor Wang filed a grievance against the University on the grounds that he had

requested but not received a meeting with the Provost and the Dean in accordance with

_____

[8]Defendant Whittingham provided a report in which he recommended against tenure for plaintiff. See Def. Exhibit F, pp. 208-09.

[9]If President DeFleur had recommended tenure then the matter would have been sent on to the Chancellor's office for decision.

the Union contract.  The grievance was settled by agreement which included as pertinent

terms that the President's letter recommending against tenure was rescinded, and

Professor Wang was afforded the opportunity to meet with Acting Dean Ricardo Laremont

(Dean Mileur had retired from the deanship in the summer of 2007 due to health reasons)

and Provost Swain following their recommendations on Plaintiff's tenure.  See Pl. Ex. A,

part 3.  Acting Dean Laremont did not decide to overturn Dean Mileur's decision against

recommending tenure, and Professor Wang met with acting Dean Laremont on November

7, 2007.  The file was then forwarded to Provost Swain.

     On December 7, 2007, Provost Swain notified Plaintiff of her decision not to

recommend tenure.  In accordance with the grievance settlement, Plaintiff was required to

notify the Provost's office within two (2) business days following the Provost's

recommendation in order to request a meeting.  The meeting was to "be arranged

expeditiously."  Id.  Plaintiff contacted the Provost's office and requested a meeting with

Provost Swain on December 11, 2007.  Provost Swain was not available on December 11

and, instead, her office offered Plaintiff the opportunity to meet either on December 13 or

December 14, 2007.  Id.   Plaintiff contended that the dates offered by the Provost's office

did not "provide adequate prior-notice for such meeting," did not provide for a long enough

meeting (the two meetings were each for ½ hour whereas Plaintiff requested a 1 hour

meeting), and the week of December 10 - December 14  was inconvenient because of

"finals and grading, and pre-scheduled meetings."  Id.  Plaintiff was advised that the

December 13th and 14th dates were the only options available before Provost Swain

forwarded her recommendation to President DeFleur.  Id.  Plaintiff did not attend either

meeting and Provost Swain's recommendation was forwarded to President DeFleur.

On January 22, 2008, President DeFleur notified Professor Wang by letter of her decision not to recommend tenure.  Plaintiff was given a one-year terminal appointment, extending his employment at Binghamton University until January 21, 2009.

In the fall of 2009, permission was granted to search for a replacement for the position to be vacated by Plaintiff.  During the 2009 – 2010 academic year the Physics Department conducted a search for a replacement.  In the spring of 2010, Dr. Joon Jang, from Korea, was hired to fill the position vacated by Plaintiff.  Dr. Jang began as an assistant professor in the fall of 2010.

Despite Plaintiff's contention to the contrary, Dr. Bruce White, a Caucasian from the United States, was not hired as a replacement for Plaintiff.  The University hired Dr. White through a special interdisciplinary program seeking individuals suited to developing an externally funded research program that coupled academic with industrial laboratory interests. This "Empire Line" was open to faculty in Chemistry, Physics and Engineering. In the fall of 2006, a search committee was formed of professors in the Materials Science program headed by Professor Stanley Whittingham of the Chemistry department.  The selection process was conducted in the 2006 - 2007 academic year.  Dr. White was selected because of his academic scientific background coupled with his corporate performance (29 separate industrial patents) for this "Empire line."[10]

---

[10]Professor White's educational background is a Bachelor of Science degree in physics from Binghamton University in 1990 and the Masters of Science and PhD degrees in condensed matter physics from Cornell University in 1993 and 1995, respectively. His research interests are in the areas of carrier transport in nanostructures, lattice vibrations of nanostructures and development of novel electron devices for information processing and energy generation. White previously was a distinguished member of the technical staff and manager of CMOS Research and Development, Freescale Semiconductor. He was a Presidential Scholar at Binghamton University, where he won the George E. Moore Award. He also received the Distinguished Innovator Award at Motorola as well as the Motorola High Impact Technology Award. He is also chair of the Emerging Technologies Session on Energy Harvesting Electron Devices for the International Electron Devices Meeting (IEDM).

In the Complaint, Plaintiff asserts that after he was denied tenure he "filed a complaint with the EEOC, alleging race, national origin, and age discrimination." Compl. ¶ 32. There is no indication in the record when this EEOC complaint was filed or the contents of it. Plaintiff contends, however, that after he filed the EEOC complaint, Defendants retaliated against him by having him improperly arrested for being on the University grounds (Plaintiff does not know whether any of the defendants were involved in this action but he believes it was instituted by Defendant Cotts);[11] by failing to give him his paycheck in a timely manner over a two month period of time (Plaintiff does not know whether any of the defendants were involved in this action); by flooding his e-mail account with over 6,000 e-mails a day (Plaintiff does not know whether any of the defendants were involved in this action); by giving him "undesirable teaching assignments and cooking up student complaints against him to get [him] fired" (Plaintiff contends that Defendants Cotts and Pompi were involved in this action); and by treating him in a threatening and hostile manner at meetings (Plaintiff contends that Defendants Cotts and Pompi were involved in this action). See Pl. Dep. pp. 14-16, 68-82.

---

[11]By Defendants' records it appears that this occurred on December 23, 2008 when someone contacted the police and advised that Plaintiff had been terminated, was in his former office, and appeared to be removing University property. See Def. Reply Ex. B. On the present record, it is unclear whether Plaintiff had, at this time, been terminated before his terminal appointment ended. When the police arrived on December 23, 2008 they had in their possession documents indicating that Plaintiff's employment had been terminated, but Plaintiff contested the issue and refused to leave. He was then arrested and issued an appearance ticket for trespassing. Id. Plaintiff testified at his deposition that the police were called on December 23, 2008 by a "department staff" but Plaintiff believes that Defendant Cotts initiated and coordinated the police contact on this date. Pl. Dep. p. 76. Defendants contend that none were involved in this incident.

Defendants' records also indicate that on December 18, 2008 police were called to the University because Plaintiff was believed to be dismantling and removing University property from his office. Def. Reply Ex. B. He then locked himself in the office preventing Defendant Cotts from entering until the police intervened. Id.

Plaintiff commenced an action in New York State Court against Binghamton University and the State University of New York alleging discrimination on the bases of age, race, and national origin in the denial of tenure.  The action was dismissed by the New York State Supreme Court, Broome County, on November 19, 2008.   This action followed.

## IV.    DISCUSSION

### a.  Title VII and ADEA Claims

To the extent Plaintiff asserts claims for the first time on summary judgment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII") and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*. ("ADEA"), the claims are dismissed.  First, no such claims are alleged in the Complaint.  Second, Title VII and ADEA claims may not be maintained against individuals in this Circuit. See Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir. 2000) (*per curiam*); Martin v. Chemical Bank, 129 F.3d 114, 1997 WL 701359 (2d Cir.1997) (unpublished).  Accordingly, all such claims are dismissed.

### b.  Discrimination in the Tenure Process - §§ 1981 & 1983

Claims brought pursuant to 42 U.S.C. § 1983 asserting intentional employment discrimination on the basis of national origin, race, or age in violation of the Fourteenth Amendment's Equal Protection Clause are evaluated under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 122 (2d Cir. 2004).  Likewise, "employment discrimination claims brought pursuant to 42 U.S.C. § 1981 apply the same analysis . . ." Grant v. Cornell University, 87 F. Supp.2d 153, 57 (N.D.N.Y. 2000)(citations

omitted).

Under the three-prong <u>McDonnell Douglas</u> framework, Plaintiff must first establish a

*prima facie* case of discrimination. "If Plaintiff makes this showing, the burden shifts to the

[deendant] to provide a legitimate, non-discriminatory purpose for its adverse employment

action. Any such stated purpose is sufficient to satisfy the defendant's burden of

production; the [defendant] does not have to persuade the court that the stated purpose

was the actual reason for its decision." <u>Id.</u>  If the defendant satisfies this burden of

production, Plaintiff is then required to show that the defendant's proffered reasons are a

pretext for discrimination, and that more likely than not the employee's [protected

classification] was a motivating factor for the [adverse employment action]." <u>Id.</u>

As Judge Mordue wrote in <u>Grant</u>,

> The Second Circuit has noted repeatedly that tenure decisions involve
> unique factors which set them apart from ordinary employment decisions,
> and federal courts should exercise caution in reviewing them. <u>See</u> <u>Fisher v.
> Vassar College</u>, 70 F.3d 1420, 1434-35 (2d Cir.1995), <u>reh'g</u> *en banc*, 114
> F.3d 1332 (2d Cir. 1997); <u>Zahorik v. Cornell Univ.</u>, 729 F.2d 85, 92 (2d Cir.
> 1984); <u>Lieberman v. Gant</u>, 630 F.2d 60, 64 (2d Cir.1980).  <u>See also</u>
> <u>Weinstock v. Columbia Univ.</u>, 1999 WL 549006, at *8 (S.D.N.Y.1999); <u>Batra
> v. Pace Univ.</u>, 1998 WL 684621, at *7 (S.D.N.Y.1998), <u>aff'd</u>,182 F.3d 898
> (2d Cir.1999); <u>Negussey v. Syracuse Univ.</u>, 1997 WL 141679, at *6
> (N.D.N.Y.1997) (Munson, S.J.). "Because tenure decisions involve a myriad
> of considerations and are made by numerous individuals and committees
> over a lengthy period of time, a plaintiff 'faces an uphill battle in [his] efforts
> to prove discrimination on the basis of race ... in the refusal to grant [him]
> tenure.'" <u>Batra</u>, 1998 WL 684621 at *7 (quoting <u>Kawatra v. Medgar Evers
> College</u>, 1997 WL 722703, at *5 (E.D.N.Y.1997)) (alterations in original).
> Thus, while tenure decisions are not immune from review, courts are
> cautious in second-guessing tenure decisions, as the "court does not sit as a
> super tenure-review committee." <u>Negussey</u>, 1997 WL 141679 at 6.

<u>Grant</u>, 87 F. Supp.2d at 157-58.

"In a discriminatory tenure denial case, [in order to establish a *prima facie* case of

discrimination] a plaintiff must show that: (1) he belongs to a protected class; (2) he was qualified for tenure; (3) he was denied tenure; and (4) the denial of tenure occurred under circumstances giving rise to an inference of discrimination." Id. at 158 (citations and footnote omitted).  While Plaintiff can establish the first and third elements of the *prima facie* case, he has not presented sufficient evidence to satisfy the second and fourth elements.

In order to show that he was qualified for tenure, Plaintiff must demonstrate that "[s]ome *significant* portion of the departmental faculty, [outside evaluators], or other scholars in the particular field hold a favorable view on the question." Zahorik v. Cornell Univ., 729 F.2d 85, 92 (2d Cir. 1984)(emphasis added).  Plaintiff has not done this.  It is undisputed that Plaintiff's tenure application was heard first by the IPC which unanimously voted to deny the grant of tenure to Plaintiff.  The matter was then reviewed by the UPC and that committee, by a vote of 8 to 0, concurred in the decision to deny tenure.  Each committee provided substantive reasons based on scholarship, research, and teaching performance that served as the basis for the denial of the grant of tenure.  Plaintiff's tenure application was also rejected by Physics Department Chair Cotts; Dean Mileur; Acting Dean Laremont; twice by Provost Mary Ann Swain; and twice by President DeFleur.

Here, as in Grant, it is undisputed that none of the faculty on the reviewing committees believed Plaintiff qualified for tenure: "indeed, the faculty unanimously voted to recommend denial of plaintiff's tenure, specifically finding that he was not qualified." Grant, 87 F. Supp.2d at 158.  "Also noticeably absent from the record is any evidence that 'some significant portion' of the referrants or scholars in plaintiff's field found him qualified for tenure." Id.  This Court concludes, as did Judge Mordue in Grant, "that too few letters or

opinions were garnered in Plaintiff's favor from outside referrants or scholars to rise to the

level of significant support, as required by Zahorik."   Id. at 159.   As a result, Plaintiff fails

to make out the second *prima facie* element.

The record also fails to support the fourth *prima facie* element, that is, that the

denial of tenure occurred under circumstances giving rise to an inference of discrimination.

Plaintiff has failed to offer sufficient direct, statistical or circumstantial evidence from which

a reasonable fact finder could conclude that his tenure reviewers held any biases

motivated by considerations of Plaintiff's race, national origin, or age.[12]

While Plaintiff bases his conclusion of discrimination on the contention that he was

replaced by Dr. White, an individual outside of Plaintiff's protected classifications, the

conclusion is unsupported. The undisputed facts on this motion are that, after Plaintiff's

tenure was denied, the University embarked on a process of finding a replacement.

Plaintiff's replacement was Dr. Jang, not Dr. White.  Inasmuch as the replacement search

commenced after the tenure decision was made, there is no causal connection between

Plaintiff's replacement by Dr. Jang and his denial of tenure.

 Further,  the undisputed facts are that Dr. White was hired through a special

interdisciplinary program seeking individuals to develop an externally funded research

program, not as a professor in the Physics Department.  Plaintiff has provided no evidence

tending to indicate that Dr. White was his replacement, such as that Dr. White performed

any of Plaintiff's functions either before or after Plaintiff was denied tenure.  Plaintiff's

---

[12]There is no indication in the record of the ages of either Dr. White or Dr. Jang, and Plaintiff has provided no evidence of comments made by reviewers about Plaintiff's age or any other circumstantial evidence that would tend to indicate that age played a role in the tenure determination.

feelings and perceptions of being discriminated against because Dr. White was hired by the University "are not evidence of discrimination." Bickerstaff v. Vassar College, 196 F.3d 435, 456 (2d Cir. 1999)(citation omitted); see id. at 448.[13]  Thus, Plaintiff has failed to establish the fourth element of a *prima facie* case.

Even assuming, *arguendo*, that Plaintiff satisfied the elements of a *prima facie* case, the claims must be dismissed nonetheless.  The Defendants have articulated a non-discriminatory reason for their recommendations against tenure – namely, that Plaintiff was not qualified for tenure at the University. This shifts the burden back to Plaintiff to establish that considerations of protected factor motivated the Defendant's recommendations.  For the reasons discussed above, Plaintiff has failed to do this. Plaintiff's speculation as to the reasons for his reviewers' tenure determinations is insufficient to create a triable question of fact in light of the properly supported evidence that the tenure decision was based on non-discriminatory reasons.  McPherson v. New York City Dept. of Educ., 457 F.3d 211, 215 n. 4 (2d Cir. 2006).[14]  Based on the present record, no reasonable fact finder could conclude that considerations of Plaintiff's race, national origin, or age motivated the tenure recommendations.  See Boise v. New York

---

[13] As indicated in Bickerstaff, on a motion for summary judgment the Court:

> must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.   This undertaking is not one of guesswork or theorization.   After all, an inference is not a suspicion or a guess.   It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist. Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances.

Bickerstaff, 196 F.3d at 448 (internal quotation marks and citations omitted).

[14](noting that speculation alone is insufficient to defeat a properly supported motion for summary judgment)

University, 201 Fed. Appx. 796, 797 (2d Cir. Aug. 14, 2006);[15] Richardson v. New York State Dep't, of Correctional Service, 180 F.3d 426, 447 (2d Cir. 1999).[16]  Accordingly, Plaintiff's claims of direct discrimination brought under §1981 and § 1983 are dismissed.

### c.  Section 1985

To state a conspiracy claim under 42 U.S.C. § 1985(3), Plaintiff must establish: (1) some racial or other class-based discriminatory animus underlying the Defendants' actions; and (2) that the conspiracy was aimed at interfering with Plaintiff's protected rights. Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 268 (1993).  Inasmuch as there is insufficient evidence that any defendant engaged in any unlawful action against Plaintiff or was motivated by any racial or other class-based discriminatory animus in their tenure decision, Plaintiff's claim of an unlawful conspiracy pursuant to § 1985 must be dismissed. See Ricioppo v. County of Suffolk, 2009 WL 577727, at *19 (E.D.N.Y. March 4, 2009),[17] aff'd, 353 Fed. Appx. 656 (2d Cir. 2009).

### d.  Retaliation

Plaintiff's retaliation claims must also be dismissed.  First, for the reasons discussed above, Plaintiff may not maintain retaliation claims under Title VII or the ADEA against the Defendants.

Second,

---

[15] ("Boise's mere speculation was insufficient to permit a reasonable inference that NYU's proffered reasons for revoking Boise's tenure and terminating his employment were illegitimate or, otherwise, pretexts.")

[16] (affirming summary judgment for employer where employee offered only her own general claim of discrimination to show that the employer's legitimate reason for terminating her was pretextual)

[17] ("The absence of an equal protection claim and the lack of proof of a discriminatory racial or class-based discriminatory animus are fatal to [Section 1985(3)] cause of action.")(citations omitted)

> [t]he Court is unaware of any Second Circuit case recognizing a retaliation claim premised on a violation of the Equal Protection Clause, brought under § 1983, see Bernheim v. Litt, 79 F.3d 318, 323 (2d Cir. 1996) ("[W]e know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination."), and the weight of authority in other circuits does not recognize such a claim. See, e.g., Teigen v. Renfrow, 511 F.3d 1072, 1086 (10th Cir. 2007); Watkins v. Bowden, 105 F.3d 1344, 1354 (11th Cir. 1997); Grossbaum v. Indianapolis-Marion County Bldg. Auth., 100 F.3d 1287, 1296 n. 8 (7th Cir. 1996).

Pappas v. New York City Bd. of Educ., 2011 WL 128509, at *2 (E.D.N.Y. Jan. 14, 2011).

Third, Plaintiff has failed to demonstrate that he engaged in speech protected by the First Amendment such to present a legally cognizable First Amendment retaliation claim. See Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147, 152 (2d Cir. 2006); Morris v. Lindau, 196 F.3d 102, 109 (2d Cir.1999). A public employee's speech may be constitutionally protected only if he has spoken out as a citizen, not as an employee, on matters of public concern, rather than on matters of personal interest, and the state lacks an adequate justification for treating the employee differently from any other member of the general public. See Garcetti v. Ceballos, 547 U.S. 410, 418 (2006); Pickering v. Board of Educ., 391 U.S. 563, 568 (1968); Cotarelo v. Sleepy Hollow Police Dept., 460 F.3d 247, 252 (2d Cir. 2006); Grillo v. New York City Transit Authority, 291 F.3d 231, 235 (2d Cir. 2002); Morris, 196 F.3d at 110. "Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." Lewis v. Cowen, 165 F. 3d 154, 163 (2d Cir. 1999). "If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction to the speech' . . ." Sousa v. Roque, 578 F.3d 164, 170 (2d Cir. 2009) (quoting Garcetti, 547 U.S. at

18

418).  "The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'" Ruotolo v. City of New York, 514 F.3d 184, 189 (2d Cir. 2008) (quoting Lewis v. Cowen, 165 F.3d 154, 63-64 (2d Cir. 1999)).

Plaintiff has not provided the EEOC complaint which, he contends, was the reason for the asserted retaliation. The mere filing of an EEOC complaint does not equate with First Amendment protected speech.[18]  Without producing the EEOC complaint or other admissible proof of its contents, Plaintiff fails to establish that he engaged in protected speech.  Moreover, the nature of EEOC complaints are to address personal grievances about the way an employee has been treated by an employer, and Plaintiff has not argued that his EEOC complaint contained more broad based claims of systemic discrimination. "[A]n employee's dissatisfaction with the conditions of his employment[] does not pertain to a matter of public concern."  Sousa, 578 F.3d at 170.  Thus, assuming that Plaintiff's EEOC complaint aired a grievance about the way he was treated by the employer, Plaintiff did not speak "as a citizen on a matter of public concern." Garcetti, 547 U.S. at 418; see also Ruotolo, 514 F.3d at 190;[19] Fusco v. City of Rensselaer, N.Y., 2006 WL 752794, at *8 (N.D.N.Y. 2006).[20]  Accordingly, Plaintiff "has no First Amendment cause of action based

---

[18]Plaintiff's citation to Johnson v. Palma, 931 F.2d 203 (2d Cir. 1991) to establish that his EEOC Complaint was protected speech is inapposite in this case because Johnson was a Title VII retaliation case, not a First Amendment retaliation case.

[19]("retaliation against the airing of generally personal grievances is not brought within the protection of the First Amendment by 'the mere fact that one or two of [a public employee's] comments could be construed broadly to implicate matters of public concern.'")(brackets in original)(quoting Ezekwo v. New York City Health & Hosp. Corp., 940 F.2d 775, 781 (2d Cir.1991)).

[20](holding that speech about individual or isolated problems within a police department, or one of its officers, is not a matter of public concern)

on [defendants'] reaction to the speech." Garcetti, 547 U.S. at 418.  The First Amendment

retaliation claim is dismissed.

### e.  Due Process

#### 1.  Denial of Property Interest

Plaintiff asserts that he was "deprived of his property interest in working as a

tenured professor for the State University of New York - Binghamton without due process,

in violation of the 14th Amendment."  Compl. ¶ 44.  In this regard, Plaintiff contends that he

"had and continues to have a specific property interest in being employed with the State

University of New York - Binghamton" but was "deprived of his aforesaid property interest

because he was denied tenure and effectively terminated from government employment

without basis or justification."  Id. ¶¶ 45-46.  For the reasons that follow, the Court finds

that Plaintiff has failed to present sufficient evidence that he had a protected property

interest.

 "Property interests are both created and defined by 'existing rules or

understandings that stem from an independent source such as state law  - rules or

understandings that secure certain benefits and that support claims of entitlement to those

benefits.'"  Ricioppo v. County of Suffolk, 2009 WL 577727, at *15 (E.D.N.Y.  March 04,

2009)(quoting Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972)).

> Tenure, once conferred, is a property interest protected by the Due Process
> Clauses of the Fifth and Fourteenth Amendments. Board of Regents of State
> Colleges v. Roth, 408 U.S. 564, 576-77, 92 S. Ct. 2701, 2708-09, 33 L.
> Ed.2d 548 (1972); Slochower v. Bd. of Higher Educ., 350 U.S. 551, 76 S. Ct.
> 637, 100 L. Ed. 692 (1956). Whether the expectation of tenure is a property
> interest, however will depend on the facts of a particular case. The Supreme
> Court, in Roth, indicated that any constitutionally cognizable property interest
> in the expectation of continued employment at an educational institution is

"created and defined by the terms of ... appointment." Roth, 408 U.S. at 578, 92 S. Ct. at 2709.

Blum v. Schlegel, 18 F.3d 1005, 1015 (2d Cir. 1994).

At the time that Plaintiff came up for tenure review, he was near the end of his 3-year renewed appointment.  The record indicates only that, given Plaintiff's 6 years of employment, he was entitled to be considered for tenure in accordance with the requirements of the Faculty-Staff Handbook.  See Def. SOMF ¶ 11.  Plaintiff has provided no citation to any rule, contract or understanding that created an entitlement to tenure or to continued employment if tenure was denied.  Thus, the due process claim premised on the asserted property interest is subject to dismissal on this basis alone.

Furthermore, Plaintiff has failed to provide any support for the contention raised in his memorandum of law that he had a protected property interest in certain procedures during the review process that were not followed in his case.  See  Pl. MOL p. 17.[21]  "[A]ny constitutional constraints on [the University's] review procedure necessarily depend on whether the interest asserted by [Plaintiff] falls within the Fourteenth Amendment's protection of 'liberty' or 'property.'" Dube v. State University of New York, 900 F.2d 587, 599  (2d Cir.1990), cert. denied sub nom Wharton v. Dube, 501 U.S. 1211, 111 S. Ct. 2814, 115 L. Ed.2d 986 (1991).  The Faculty-Staff Handbook, attached as Defendants' Exhibit E, does not contain the procedures for tenure review.  See Faculty-Staff Handbook,  IV.A.5 & IV.A.8.  Although Plaintiff's grievance was settled by the stipulation that Plaintiff would be given the opportunity to meet with the Provost and the Acting Dean,

---

[21] Plaintiff asserts that his constitutional due process rights were violated by the "irregularities" in the tenure review process, by the harassment that he suffered by his co-workers, and by being denied "a full opportunity to dispute the University's decision to deny him tenure."

Plaintiff has cited no rule, contract or understanding that entitled him to these personal meetings or that created a property interest in any other particular procedure not following in this matter.  Accordingly, Plaintiff  "has failed to meet the threshold requirement of establishing a protected 'liberty' or 'property' interest" in the review procedure.  Dube, 900 F.2d at 599.

To the extent that Plaintiff asserts a deprivation of his substantive due process rights, that claim must also be dismissed.

> Substantive due process rights are violated only when the government has engaged in conduct so egregious it "shocks the conscience." Rochin v. California, 342 U.S. 165, 172, 72 S. Ct. 205, 96 L.Ed. 183 (1952). The Supreme Court has "been reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended." Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S. Ct. 1061, 117 L. Ed.2d 261 (1992). Conduct that is merely "incorrect or ill-advised" does not meet this standard. See Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994).

Ricioppo, 2009 WL 577727, at *15.

Nothing asserted in the Complaint, or alleged by Plaintiff to have occurred to him either before or after the tenure review process, was so egregious that it "shocks the conscience."  Accordingly, summary judgment is warranted on any substantive due process claim asserted in this matter.  See id.

### 2.  Stigma Plus

Plaintiff also asserts in the Complaint that "[i]n denying [him] tenure and effectively terminating his employment, Defendants made false statements about Plaintiff's qualifications and experience as a professor, sufficient to satisfy the 'stigma-plus' test." Compl. ¶ 49. Despite this contention, however, Plaintiff has failed to point to any evidence that any of the Defendants defamed him in any way or, if they did so, that it was done in

22

such a manner as to foreclose future employment opportunities in Plaintiff's field. <u>See</u>

<u>Patterson v. City of Utica</u>, 370 F.3d 322, 329-30 (2d Cir. 2004).  Accordingly, any liberty-

based due process claim is dismissed.

**V.      CONCLUSION**

For the reasons discussed above, Defendants' motion for summary judgment [dkt.

# 45] is **GRANTED** and all claims in this matter are **DISMISSED**.

**IT IS SO ORDERED**

DATED:March 14, 2011


Thomas J. McAvoy
Senior, U.S. District Judge